# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE GOPRO, INC. STOCKHOLDER | ) | **CONSOLIDATED** |
| DERIVATIVE LITIGATION | ) | **C.A. No. 2018-0784-JRS** |

## MEMORANDUM OPINION

Date Submitted:  February 5, 2020
Date Decided:  April 28, 2020

Seth D. Rigrodsky, Esquire, Brian D. Long, Esquire and Gina M. Serra, Esquire of Rigrodsky & Long, P.A., Wilmington, Delaware and Melinda A. Nicholson, Esquire and Nicolas Kravitz, Esquire of Kahn Swick & Foti, LLC, New Orleans, Louisiana, Attorneys for Lead Plaintiffs Chaile Steinberg, Steve Noury, Barbara Silberfeld and Richard Silberfeld.

R. Judson Scaggs, Jr., Esquire, Susan W. Waesco, Esquire and Riley T. Svikhart, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware and Susan S. Muck, Esquire, Catherine D. Kevane, Esquire and Marie C. Bafus, Esquire of Fenwick & West LLP, San Francisco, California, Attorneys for Defendants Nicholas Woodman, Brian McGee, Anthony Bates, Charles "CJ" Prober, Edward Gilhuly, Kenneth Goldman, Peter Gotcher, Alexander Lurie, Susan Lyne, Michael Marks, Frederic Welts and Lauren Zalaznick, and Nominal Defendant GoPro, Inc.

**SLIGHTS, Vice Chancellor**

In early 2016, the camera manufacturer, GoPro, Inc. ("GoPro" or the "Company"), planned to roll out two new products to the market, a drone that would house state of the art GoPro cameras and the latest iteration of its signature wearable camera. GoPro provided revenue guidance for 2016 based on projected sales of both products. The forecasts were positive. The product launch for the drone was expected to occur in the first half of 2016, and the new camera was to be ready for market well in advance of the 2016 holiday shopping season.

Unfortunately, the road to market, especially for the drone, was bumpier than expected. GoPro announced that the product launch for the drone would be delayed as it worked out several kinks in the product. Yet its revenue guidance remained unchanged. Once the products were unveiled in the fall of 2016, the Company faced production ramp-up issues, inventory shortages, higher than expected product returns and ultimately a product recall of the drone. GoPro's board of directors (the "Board") eventually caused the Company's revenue guidance to be adjusted to account for these problems. When the dust settled, GoPro generated $1.185 billion in revenue during 2016—short of the Company's updated revenue guidance of $1.25–$1.3 billion. The Company's stock price suffered a 12% decline in response to the revenue miss.

In the wake of GoPro's 2016 difficulties, Company stockholders filed class action complaints in federal court alleging that certain GoPro fiduciaries violated

federal securities laws because, as of October 2015, they *knew* the Company could not meet its annual revenue guidance yet failed timely to disclose this reality to stockholders. Based on similar factual allegations, two groups of Plaintiffs have filed complaints in this court alleging certain GoPro officers and directors breached their fiduciary duties. In addition, Plaintiffs seek to hold certain fiduciaries liable under the theory first articulated in this court's decision in *Brophy v. Cities Service Co.* for trading in GoPro stock in a manner that exploited their knowledge of non-public Company information.[1]

The two actions in this court have been consolidated and a Verified Stockholder Derivative Complaint (the "Complaint") has now been designated as the operative complaint.[2] Defendants have filed a Motion to Dismiss (the "Motion") that Complaint for failure to state viable claims and failure to plead demand futility with the particularity required by Delaware law.[3]

---

[1] *Brophy v. Cities Serv. Co.*, 70 A.2d 5 (Del. Ch. 1949).

[2] *See* Verified S'holder Deriv. Compl. ("Compl.") (D.I. 1) (filed in Consol. Action No. 2018-0812); *Steinberg v. Woodman, et al.*, C.A. No. 2018-0784-JRS (D.I. 1) (the "Steinberg Action"); Order for Consolidation of the Related Actions, Appointment of Co-Lead Counsel and Acceptance of Service (the "Consolidation Order") (D.I. 5) (consolidating the Steinberg Action with the later-filed case captioned *Noury, et al. v. Woodman, et al.*, C.A. No. 2018-0812-JRS).

[3] D.I. 9.

As discussed below, the Motion must be granted. Plaintiffs have failed to plead with particularity that a majority of the Board in place when the Complaint was filed (the "Demand Board" as further defined below) is unfit to consider a demand. Plaintiffs' theory of demand futility hinges on their conclusory allegations that a majority of the Demand Board face a substantial likelihood of liability for breach of fiduciary duty because they *knew* GoPro could not meet its revenue guidance even as its management repeated stale, overly optimistic revenue projections.[4] Yet the very Board presentations Plaintiffs point to as support for these allegations (which have been incorporated by reference into the Complaint) reveal that GoPro management was regularly advising the Board that, notwithstanding production difficulties, GoPro was on track to meet its inventory projections and hit its revenue guidance. The Board was under no obligation to disclose what it did not know or did not believe to be true. Nor was it obliged to doubt the information it was receiving from GoPro's managers.

Plaintiffs have likewise failed to plead facts that support an inference the Board could not competently consider a demand in the shadow of the federal securities litigation for the simple reason that a majority of the Demand Board faced no liability in that action. Plaintiffs' final demand futility argument—that a majority

---

[4] *See* Compl. ¶¶ 91–93; Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss the Verified S'holder Deriv. Compl. ("PAB") (D.I. 20) at 10–11.

of the Demand Board was beholden to the Company's controlling stockholder/CEO and could not, therefore, have competently considered a demand to prosecute claims against him—is likewise not well pled. Alleging only that the controller/CEO could remove Board members "at will" says nothing of their independence for purposes of demand futility.

After carefully reviewing the Complaint, I have no reasonable doubt that a majority of the Demand Board could exercise independent and disinterested business judgment in responding to a demand. The Complaint, therefore, must be dismissed.[5]

## I. FACTUAL BACKGROUND

I draw the facts from the allegations in the Complaint, documents incorporated by reference or integral to that pleading and judicially noticeable facts.[6] For purposes of this Motion, I accept as true the Complaint's well-pled factual allegations and draw all reasonable inferences in Plaintiffs' favor.[7]

---

[5] Given the Court's conclusion that Plaintiffs have not met their pleading burden under Rule 23.1, I do not reach the question of whether Plaintiffs have pled viable claims under Rule 12(b)(6).

[6] *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (quoting *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 69 (Del. 1995)) (noting that on a motion to dismiss, the court may consider documents that are "incorporated by reference" or "integral" to the complaint); D.R.E. 201–02 (codifying Delaware's judicial notice doctrine).

[7] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002).

4

## A. Parties and Relevant Non-Parties

Nominal defendant, GoPro, is a publicly-traded Delaware corporation engaged in the consumer electronics business.[8]  The Company manufactures and sells mountable and wearable cameras, drones and related accessories.[9]

Defendant, Nicholas Woodman, founded GoPro in 2004 and has served as a Board member and the Company's CEO since the Company's inception.[10]  As of the time the Complaint was filed, Woodman is alleged to have owned 75.97% of GoPro's outstanding shares of common stock.[11]  In addition to Woodman, Defendants, Brian McGee (CFO), Anthony Bates (President) and Charles Prober (COO) (collectively, the "Officer Defendants") were all GoPro officers during the period of wrongdoing alleged in the Complaint.[12]

The nine-member Board in place as of the filing of the first complaint in this action (the "Demand Board") is comprised of Defendants, Woodman, Kenneth Goldman, Peter Gotcher, Alexander Lurie, Lauren Zalaznick, Susan Lyne and

---

[8] Compl. ¶¶ 28–29.

[9] Compl. ¶ 3.

[10] Compl. ¶ 30.  Woodman has also served as Chairman of the Board since 2014 and served as President from 2004 until 2014. *Id.*

[11] Compl. ¶¶ 30, 195.

[12] Compl. ¶¶ 30–34, 44.

Frederic Welts, as well as non-parties, Ty Ahmad-Taylor and James Lanzone.[13] Goldman, Gotcher and Zalaznick also served on the Board's Audit Committee during some or all of the relevant time period.[14] Seven of the nine members of the Demand Board are named as Defendants in this action. The Complaint also names as Defendants former Board members, Michael Marks and Edward Gilhuly (collectively, with Woodman, Bates, Goldman, Gotcher, Lurie, Zalaznick, Lyne and Welts, the "Director Defendants"), both of whom left the Board in June 2017.[15]

Plaintiffs, Charlie Steinberg, Steve Noury and Barbara and Richard Silberfeld were GoPro stockholders during the events alleged in the Complaint and have remained stockholders since.[16] They purport to bring the Complaint derivatively on behalf of the Company.[17]

### B. GoPro's 2016 Product Line

GoPro's initial focus was terrestrial in that it developed cameras for users either to handle or wear.[18] Its first product was the wearable "HERO" camera and

---

[13] Compl. ¶ 183.

[14] Compl. ¶¶ 36–37, 42, 46, 191.

[15] Compl. ¶¶ 35, 40.

[16] Compl. ¶¶ 21–23; Consolidation Order ¶ 7.

[17] Compl. ¶¶ 1, 21–23, 173.

[18] Compl. ¶ 70.

6

the advanced iterations of this camera continue to comprise the Company's core product line.[19] In 2016, GoPro planned to take to the air by expanding into the drone market.[20] The Company hoped to make its flying debut with a drone it called "Karma."[21]

**C. GoPro's 2016 Revenue Projections and Karma's Pre-Launch**

GoPro runs an inventory-driven business. And, like many manufacturers, GoPro utilizes a "real-time" enterprise resource planning ("ERP") management system to monitor its supply chain.[22] ERP software "integrates areas such as planning, purchasing, inventory, sales, marketing, finance and human resources."[23] GoPro's ERP system is enabled by the "NetSuite" software.[24]

On February 3, 2016, utilizing NetSuite, GoPro issued full-year revenue guidance disclosing expected revenue of $1.35–$1.5 billion in 2016.[25] As was customary, the Company cautioned investors that its projections were "forward-

---

[19] *Id.*

[20] Compl. ¶¶ 4, 70, 81–82.

[21] Compl. ¶ 5.

[22] Compl. ¶ 72.

[23] *Id.*

[24] Compl. ¶ 74.

[25] Compl. ¶¶ 4, 82.

looking statements regarding future events" that were laced with "risks and uncertainties."[26] On the same day it disclosed annual revenue forecasts, the Company announced its plan to enter the drone market "in the first half of 2016."[27]

Three months later, during a May 3, 2016 Board meeting, management advised the Board that the Company was experiencing "delays" with Karma.[28] Even so, management assured the Board that "Karma deliverables [were] on track" and that management was "tracking" Karma's "launch" for a "6/6 announce."[29]

Slides presented to the Board at the May 3 meeting show the Company had no Karma inventory "on hand" for "Q1'15" through "Q1-16."[30] The Board also

---

[26] GoPro, Inc., Current Report Ex. 99.1 (Form 8-K) (Feb. 3, 2016) (the "February 8-K") ("Note on Forward-looking Statements"); *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del. 2006) (noting that the trial court may take judicial notice of facts in SEC filings that are "*not subject to reasonable dispute*") (emphasis in original). The Company identified multiple sources of risk including the Company's (i) "dependence on sales" and "third-party suppliers" to "provide components for our products" and (ii) potential "inability to successfully manage frequent product introductions and transitions." *See* February 8-K.

[27] Compl. ¶ 82.

[28] *Id.* The Board was told Karma's "delays [were] adding risk" to a related product referred to as "Yellowstone," which is described as a "storytelling, cloud service, subscription." Transmittal Aff. of Gina M. Serra in Supp. of Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss the Verified S'holder Deriv. Compl. ("Serra Aff.") (D.I. 20) Ex. 3 at NOURY_GPRO220_000051. Bates numbers for documents produced in response to shareholder inspection demands under 8 *Del. C.* § 220, cited in the affidavits submitted in connection with the Motion, are referred to as "GoPro220_XXXXXX."

[29] Serra Aff. Ex. 3 at GoPro220_000051, 57.

[30] *Id.* at GoPro220_000046.

8

learned that "Kirkwood" (a codename for the Karma drone) "repairs" were occurring during the "Q4 2015" through "Q2 2016" timeframe.[31]

Two days later, on May 5, Woodman publicly disclosed that Karma's launch "would be delayed until [the 2016] holiday season," even as he touted the drone's "revolutionary features."[32] At the same time, McGee, the CFO, reiterated the Company's revenue guidance range of $1.35–$1.5 billion.[33]

Two months later, in July, management reports to the Board continued to show the Company had no Karma drones in inventory.[34] Nevertheless, GoPro's release of Q2 2016 financial results stood by earlier revenue guidance.[35] At this juncture, Bates, the Company's President, told investors GoPro was "closely tracking [inventory] and making sure that [GoPro] can ramp into our second half plans."[36] Similarly, McGee publicly opined the Company had "done a great job in

---

[31] Compl. ¶ 83; Serra Aff. Ex. 3 at GoPro220_000069.

[32] Compl. ¶¶ 5, 83, 189 (bullet 1).

[33] Compl. ¶ 189 (bullet 2).

[34] Compl. ¶ 85 (citing GoPro220_000093–95). The Complaint states that the Board viewed these slides on August 2, 2016, when the slides, themselves, state they are part of the Board's "July 18, 2016" meeting materials. *See* Serra Aff. Ex. 5 at GoPro220_000093.

[35] Compl. ¶¶ 84, 189 (bullet 3).

[36] Compl. ¶¶ 87, 189 (bullet 5).

channel inventory" and predicted GoPro would "be ready for a heck of a launch in the second half" of the year.[37]

Shortly after these public statements, during an August 2, 2016 meeting, the Board received updates from GoPro's management regarding the status of new product development.[38] The Complaint highlights several allegedly troublesome slides from management's presentation to the Board.[39] In a slide titled "Operating Expenses," management disclosed the "spend" for the Karma "project" was "unfavorable at $5.4M, ($2.9M) to Q2M1."[40] A separate slide titled "Aerial Products Roadmap" advised the Board that certain aspects of the Karma project that had been planned for 2017 and 2018 were "at risk."[41]

About one month later, on September 19, 2016, the Company unveiled three new, highly anticipated products—the HERO5, HERO5 Black and the Karma drone.[42] Karma was scheduled for launch on October 23, 2016, at "select retailers around the world," while the HERO5 camera would be distributed "globally"

---

[37] Compl. ¶ 189 (bullet 4).

[38] Compl. ¶ 88.

[39] *Id.*

[40] *Id.*; Serra Aff. Ex. 6 at GoPro220_00101.

[41] Compl. ¶ 88; Serra Aff. Ex. 6 at GoPro220_00106.

[42] Compl. ¶ 89.

beginning on October 2.[43]  Simultaneously with news of these new product launches, McGee continued to reassure investors the Company was "on track" to meet its revenue guidance of $1.35–$1.5 billion.[44]  This reaffirmation was based, in part, on management's projection that its trio of new offerings would account for the "vast majority of GoPro's full-year revenue occurring in the second half of the year."[45]  As of September 19, the Company had only 2,500 Karma drones in inventory (worth ~$2 million).[46]

Less than one month after Karma's launch announcement, Woodman repeated that GoPro was ready to make Karma drones "available on October 23."[47]  Customers who had signed up for Karma's pre-sale were told the drone would ship on November 28, 2016.[48]

During the October 6, 2016 Board meeting, management presented a "Summary" slide to the Board.[49]  This slide calculated the Company's total

---

[43] Compl. ¶¶ 89, 91, 106, 189 (bullet 8).

[44] Compl. ¶¶ 6, 92, 105, 189 (bullet 7).

[45] Compl. ¶ 90 (alteration in original).

[46] Compl. ¶ 93.

[47] Compl. ¶ 96.

[48] *Id.*

[49] Compl. ¶¶ 97, 105; Serra Aff. Ex. 8 at GoPro220_000121.

"Q4 revenue risk" was "($45M–$110M)," of which "Karma" comprised "($20M–$85M)."[50]  The Board also reviewed a slide titled "Bull and Bear Case," which appears to analyze the Company's stock price in a "Q3" "Bull" or "Bear" market assuming Karma was "in retail" or, alternatively, with "No Karma."[51]

## D. Karma's Turbulent Flight

As fall approached, GoPro was entering the critical run-up to the holiday season.[52]  On October 23, Karma sales began as the Company had projected, and 2,500 customers acquired the drone.[53]  But GoPro's inventory fell short of demand. Several would-be customers posted to GoPro's customer service website "lamenting the unavailability of the drone."[54]  On October 24, *TheStreet, Inc.* reported that shipment dates for "most" Karma drones had been moved to November 28 and that HERO5 supply was low.[55]  Soon after, GoPro's stock price fell ~7%.[56]

---

[50] Compl. ¶¶ 97, 105; Serra Aff. Ex. 8 at GoPro220_000121.

[51] Compl. ¶ 107; Serra Aff. Ex. 8 at GoPro220_000122.

[52] *See, e.g.*, Compl. ¶ 105 (highlighting quotes from an October 6, 2016 Board slide).

[53] Compl. ¶ 100.

[54] Compl. ¶¶ 9, 98.

[55] Compl. ¶¶ 10, 99, 106.

[56] Compl. ¶¶ 10, 99, 106.

On the same day *TheStreet* published its report, the Board's Audit Committee met to discuss GoPro's "Q3" results for the period ended September 30.[57] The Complaint features two slides presented at this meeting.[58] *First*, the committee reviewed a report stating the Company had no "Aerial" in its inventory as of "Q3'16" (i.e., before Karma's October 23 launch).[59] *Second*, the committee was apprised of "Significant Accounting and Reporting Items," which included, *inter alia*, a "Look[] ahead" to "Q4'16."[60] The look ahead comprised three bullet points, one of which was captioned "Revenue recognition—Karma sales returns reserve."[61]

Five days after Karma first went on sale, on October 28, Brian Warholak, "one of the first customers to purchase the Karma drone," uploaded a video to YouTube of his new drone crashing to the ground due to a battery defect.[62] Other customers reported the same defect on GoPro's online support hub.[63] The Company eventually

---

[57] Compl. ¶ 108.

[58] *Id.*

[59] Compl. ¶¶ 108, 192; Serra Aff. Ex. 12 at GoPro220_000198. "Q3" ended on "September 30, 2016"—which was before Karma was slated to be available for sale (*i.e.*, October 23). *See* Serra Aff. Ex. 12 at GoPro220_000195; Compl. ¶ 7.

[60] Compl. ¶ 108; Serra Aff. Ex. 12 at GoPro220_000197.

[61] Compl. ¶ 108; Serra Aff. Ex. 12 at GoPro220_000197.

[62] Compl. ¶ 100.

[63] *Id.*

determined that the drone's battery could "pop out" in flight due to a defective latch; the result, frequently, was a rapid, uncontrolled descent ending in a spectacular crash.[64]

Nine days after Karma hit the shelves, the Board held a meeting on November 1 to discuss "Supply Chain and Sales Status for HERO5 and Karma products."[65] The Board reviewed a slide (the "Karma Production Forecast") summarizing the "Karma Supply Chain."[66] The Karma Production Forecast reviewed management's assessment of GoPro's ability to manufacture additional Karma drones, including the "yield rates" of the relevant manufacturing facilities.[67] The upshot of the slide was that management's "Very Early-Targeting" for Karma production was "80K in 4th quarter."[68]

---

[64] Compl. ¶¶ 12, 100–01.

[65] Transmittal Aff. of Riley T. Svikhart ("Svikhart Aff.") (D.I. 14) Ex. 6 at GoPro220_000135, 38; Compl. ¶¶ 98, 100 (Karma went on sale on October 23).

[66] Svikhart Aff. Ex. 6 at GoPro220_000138.

[67] The slide shows a grid of five separate suppliers for six component parts of the Karma drone (*e.g.*, "Drone," "Grip," "Charger," "Stabilizer/Harness") as well as the facilities around the world where the parts were being produced. Each facility's "Workforce/Capacity" was listed, along with the facility's "Rolled Yield" for the part it manufactured. *See* Svikhart Aff. Ex. 6 at GoPro220_000138.

[68] Svikhart Aff. Ex. 6 at GoPro220_000138.

Notwithstanding the optimistic report on inventory, GoPro was still having difficulty getting Karma units on retailers' shelves.[69]  In light of "production ramp up issues," on November 3, 2016, McGee issued a press release lowering GoPro's 2016 full-year revenue guidance from $1.35 billion to $1.25–$1.3 billion.[70]  The press release explained GoPro's new fourth quarter projections assumed Karma sales would account for ~10% of the Company's fourth-quarter revenues.[71]  Analysts calculated GoPro would need to generate $60 million in revenue from Karma to meet the new guidance (~50,000–75,000 units).[72]

One day later, on November 4, the market reacted to the updated guidance, and GoPro's stock fell 6.5%.[73]  That same day, the Company filed its Form 10-Q for the third quarter.[74]  The 10-Q added new cautionary language for investors, stating the Company faced risk from potential inability to ensure "the availability of products in appropriate quantities."[75]  Yet, as of the November 4 filing, GoPro

---

[69] Compl. ¶¶ 9, 98.

[70] Compl. ¶¶ 11, 109.

[71] Compl. ¶¶ 109–10, 189 (bullet 9).

[72] Compl. ¶¶ 111–12.

[73] Compl. ¶ 114.

[74] Compl. ¶ 115.

[75] *Id.*

reassured customers that Karma was and would be "available at major U.S. retailers."[76]

Shortly after Karma's initial launch on October 23, and just eleven days after the first online reports of Karma's battery latch issue, the Board met on November 8, 2016, to discuss "recent information relating to a power issue with the Karma drone."[77] Following the meeting, the Board directed a recall of the Karma drone because of the defect at a time when the Company had sold only 2,500 units.[78] The next day, GoPro's stock fell another 4%.[79] As a result of Karma's battery defect and supply chain difficulties, the drone was not available for sale during the 2016 holiday season.[80]

### E. Karma Supply Fallout

On February 2, 2017, GoPro reported its 2016 results.[81] The Company disclosed it had generated $1.185 billion in revenue for the year (short of the updated

---

[76] Compl. ¶¶ 117, 189 (bullet 10).

[77] Compl. ¶¶ 98, 100 (noting the original online reports were posted on October 28), ¶ 116.

[78] Compl. ¶¶ 12, 117.

[79] Compl ¶ 117.

[80] Compl. ¶¶ 118–19.

[81] Compl. ¶ 119.

November 9 projection of $1.25–$1.3 billion).[82]   GoPro stated its "biggest challenge" was the Karma drone.[83]  On this news, GoPro's stock fell another 12%.[84]  Plaintiffs allege Defendants, Woodman, McGee, Bates, Gilhuly and Marks (the "Selling Defendants"), sold GoPro stock between March and December 2016, before the 2016 year-end results were released.[85]

## F. Procedural Posture

Following the Company's lowered Q4 revenue guidance and the resulting 6.5% decline in stock price, certain GoPro stockholders filed a class action complaint on November 16, 2016, in the United States District Court for the Northern District of California (the "California Court") alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act.[86]  On July 26, 2017, the California Court denied a motion to dismiss, finding plaintiffs had well pled Woodman, McGee and Bates made false or misleading statements concerning Karma.[87]

---

[82] Compl. ¶¶ 109, 119–20.

[83] Compl. ¶¶ 13, 119–20.

[84] Compl. ¶ 120.

[85] Compl. ¶¶ 17, 160–165.

[86] Compl. ¶¶ 109–114; *Bielousov v. GoPro, Inc.*, 2017 WL 3168522, at *1 (N.D. Cal. July 26, 2017).

[87] *Bielousov*, 2017 WL 3168522, at *4–6.  On October 30, 2018, the California Court granted an Order Preliminarily Approving Settlement in the *Bielousov* action.  Svikhart Aff. Ex. 11.

Shortly after proceedings began in the California Court, on September 26, 2017, Plaintiffs sent a series of four separate demands to the Company, requesting books and records under 8 *Del. C.* § 220 of the Delaware General Corporation Law.[88] In response, the Company produced ~1,100 pages of material.[89]

Armed with these documents, while litigation in the California Court was ongoing and without making a litigation demand on the Board, Plaintiffs filed two separate derivative complaints in this court.[90] The first complaint, filed on October 30, 2018, has since been consolidated with the operative Complaint, which was filed days later on November 7, 2018.[91]

The Complaint comprises four derivative counts.[92] Count I alleges the Officer Defendants breached their fiduciary duties by, *inter alia*, "keep[ing] the market

---

[88] Compl. ¶¶ 24–27, 174–77.

[89] Compl. ¶¶ 24–27.

[90] *See* Consolidation Order at 3.

[91] *See* Consolidation Order ¶ 1. The Court entered a Consolidation Order on December 3, 2018 (i) directing all future filings to be submitted to Consolidated Action Number 2018-0784, (ii) designating the Complaint as the operative complaint and (iii) designating Plaintiffs, Steinberg, Noury and Barbara and Richard Silberfeld, as lead Plaintiffs. *See id.* ¶¶ 2–7.

[92] Compl. ¶¶ 170, 200–28. In their Answering Brief, Plaintiffs clarified they are no longer pursuing claims based on the now-dismissed consolidated securities class action styled *Park v. GoPro, Inc.*, which had been filed in the California Court. PAB at 21 n.11. Plaintiffs also disavowed any claims based on allegedly false and misleading statements occurring after February 2, 2017. PAB at 21 n.11. In this regard, I note there is a discrepancy in Plaintiffs' Answering Brief regarding the cut-off date for their claims. *Compare* PAB at 21 n.11 ("February 2, 2018), *with* PAB at 29 n.12 ("February 2017.").

18

unaware of problems with inventory and sales."[93]  Counts II and III allege the Director Defendants breached their fiduciary duties when they "allowed, ignored, or encouraged [] numerous materially false and misleading statements and omissions" by certain Officer Defendants.[94]  Count IV is a *Brophy* claim brought against the Selling Defendants.[95]

On May 2, 2019, Defendants filed the Motion in which they seek dismissal of the Complaint under Court of Chancery Rules 12(b)(6) and 23.1.[96]  The Motion was submitted for decision on February 5, 2020.[97]

## II.  ANALYSIS

As noted, Plaintiffs elected to forego making a pre-suit demand.  Accordingly, under Court of Chancery Rule 23.1, they must "state with particularity" their reasons

Based on the sections of the Complaint Plaintiffs direct the Court to disregard, it appears the relevant cut-off date is February 2017, not February 2018.  *See* PAB at 21 n.11 (citing Compl. ¶¶ 14–16, 122–59, 169, 185).

[93] Compl. ¶¶ 200–04.

[94] Compl. ¶¶ 205–20.

[95] Compl. ¶¶ 221–28.

[96] D.I. 9.  Following briefing on the Motion, Plaintiffs filed a Motion to Strike certain exhibits Defendants submitted in support of the Motion, arguing they were outside the scope of documents referenced in the Complaint.  D.I. 18.  I do not reach the Motion to Strike as I have not relied on any of the documents to which Plaintiffs object in reaching my decision on the Motion.

[97] D.I. 38.

for not asking the Demand Board to pursue their derivative claims.[98]  Plaintiffs advance four arguments as to why their Complaint adequately pleads demand futility.  First, they maintain that a majority of the Demand Board "faces a substantial likelihood of personal liability" because they "allowed and/or failed to correct" certain false statements.[99]  Second, they argue that a majority of the Demand Board is beholden to Woodman because he could "easily remove[]" any director who "took an action antithetical to" his wishes.[100]  Third, they argue the Demand Board would be interested in any decision to bring a *Brophy* claim against the Selling Defendants because "pressing forward" with Count IV would subject them to "liability in connection with the false and misleading statements" they allowed to be made with regard to Karma.[101]  Finally, they allege the *Bielousov* action, itself, renders a majority of the Demand Board "interested" in a hypothetical decision to bring Plaintiffs' claims because to do so would be "tantamount to admitting liability."[102]

---

[98] Compl. ¶ 182; Ct. Ch. R. 23.1(b); *Aronson v. Lewis*, 473 A.2d 805, 813–14 (Del. 1984), *overruled in part*, *Brehm v. Eisner*, 746 A.2d 244, 253–54 (Del. 2000).

[99] Compl. ¶¶ 187–89, 191–92.

[100] Compl. ¶ 195.

[101] Compl. ¶¶ 160–65; PAB at 49–50.

[102] Compl. ¶ 184; PAB at 50.

## A. The Rule 23.1 Standard

As Justice Moore emphasized in his seminal *Aronson* decision, 8 *Del. C.* § 141(a) codifies a bedrock of Delaware corporate law—the board of directors, not stockholders, manages the business and affairs of the corporation, including the business decision to cause the corporation to sue.[103] When making this (or any other) business decision, a board is entitled to "a presumption" that it "acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[104]

With these canons as a backdrop, our law has established certain procedural imperatives to ensure that shareholders do not "imping[e] on the managerial freedom of directors" lest the board's judgment be "sterilize[ed]."[105] To mount a successful "challenge to a board of directors' managerial power" and wrest control of a corporation's litigation asset away from that decision-making authority, the stockholder must demonstrate that demand on the board to pursue the claim would be futile such that the demand requirement should be excused.[106]

---

[103] *Aronson*, 473 A.2d at 811 (citing 8 *Del. C.* § 141(a)).

[104] *Id.* at 812 (citation omitted).

[105] *Id.* at 811, 814; *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984), *overruled on other grounds*, *Brehm*, 746 A.2d at 253–54.

[106] *Spiegel v. Buntrock*, 571 A.2d 767, 773 (Del. 1990); *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1044 (Del. 2004).

In order to meet this heightened pleading burden, the Complaint must "comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings" sanctioned by Chancery Rule 8.[107] Specifically, the plaintiff pleading demand futility must "inform[] [the] defendants of the precise transactions at issue" by describing "with particularity" the "specific misconduct in which each defendant is alleged to have participated."[108] When assessing whether the plaintiff has met this heightened burden under Rule 23.1, the plaintiff is entitled to "all reasonable inferences" that logically flow from "particularized facts" alleged in the complaint.[109] But the court need not credit "conclusory allegations" or "inferences that are not objectively reasonable" when testing the sufficiency of a pleading.[110]

"Two tests are available to determine whether demand is futile."[111] "In simple terms, [both] tests permit a corporation to terminate a derivative suit if its board is

---

[107] *Brehm*, 746 A.2d at 254 (noting that conclusory statements or mere notice pleading are insufficient to satisfy Rule 23.1).

[108] *Elburn v. Albanese*, 2020 WL 1929169, at \*9 (Del. Ch. Apr. 21, 2020) (citations omitted).

[109] *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008).

[110] *Id.* (internal quotation omitted).

[111] *Id.*

comprised of directors who can impartially consider a demand."[112]  The *Aronson* test

applies to claims "where it is alleged that the directors *made a conscious business*

*decision* in breach of their fiduciary duties."[113]  The *Rales* test applies "where the

subject of a derivative suit is not a business decision of the Board" but rather a failure

to act.[114]

Although this court has observed that the demand futility analysis frequently

"would be no different" under either *Aronson* or *Rales*,[115] this court has also noted

the incongruity in pleading that occurs when a plaintiff characterizes the same set of

underlying conduct as both a wrongful "failure to act" *and* a wrongful "affirmative

decision."[116]  Even if acceptable as a matter of alternative pleading, when the

plaintiff struggles consistently to characterize the nature of the underlying wrongful

---

[112] *In re Oracle Corp. Deriv. Litig.*, 824 A.2d 917, 939 (Del. Ch. 2003).

[113] *Wood*, 953 A.2d at 140 (emphasis supplied and citation omitted).

[114] *Id.* (citing *Rales v. Blasband*, 634 A.2d 927, 932–33 (Del. 1993)); *Zucker v. Andreessen*, 2012 WL 2366448, at *6 (Del. Ch. June 21, 2012).

[115] *See Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 68 n.132 (Del. Ch. July 13, 2015); *In re China Agritech, Inc. S'holder Deriv. Litig.*, 2013 WL 2181514, at *16 (Del. Ch. May 21, 2013).

[116] *In re Duke Energy Corp. Deriv. Litig.*, 2016 WL 4543788, at *15 (Del. Ch. Aug. 31, 2016); *Hubert Owens v. Tim M. Mayleben*, 2020 WL 748023, at *6 (Del. Ch. Feb. 13, 2020).

conduct that gives rise to his claims, this imprecision signals that he may not have pled such conduct *with particularity*.[117]

As discussed below, Plaintiffs' Complaint is a model of this sort of imprecision. On the one hand, Plaintiffs allege Defendants "caused" GoPro publicly to issue false statements regarding the status of its new product releases and the corresponding projections of revenue.[118] On the other, Plaintiffs allege Defendants failed to act when they "consciously failed to monitor [the] information and reporting systems" that could have prevented the same false statements.[119] In any event, while many of Plaintiffs' demand futility arguments are discordant, the one clear note is that a majority of the Demand Board face "a substantial likelihood of liability" for their actions (and/or inactions) surrounding GoPro's public statements in 2016.[120] But, as discussed below, the Complaint lacks sufficient factual particularity to support this assertion, either as an affirmative choice to mislead stockholders or as a matter of poor oversight. Similarly, Plaintiffs' last-ditch

---

[117] *See Brehm*, 746 A.2d at 254.

[118] Compl. ¶¶ 2, 65.

[119] Compl. ¶ 209. *Compare* Compl. ¶ 210 (Defendants "encouraged" false statements"), *and* Oral Arg. on Pls.' Mot. to Strike and Defs.' Mot. to Dismiss the Verified S'holder Deriv. Compl. ("Tr.") (D.I. 39) at 36–38 ("[W]e don't think this is a *Caremark* claim."), *with* PAB at 41 (Defendants "face a substantial risk of liability under a classic *Caremark* theory for failing to apprise themselves" of GoPro's "inadequate Karma drone supply.").

[120] Compl. ¶¶ 187–92; PAB at 30, 36.

arguments related to either the *Bielousov* action or the *Brophy* claim also lack merit as neither impugns the fitness of a *majority* of the Demand Board to consider a demand.[121]

**B. Plaintiffs Have Failed to Well Plead Demand Futility With Respect to Counts II and III**

Demand is excused when a plaintiff adequately alleges a majority of the Demand Board is "interested" because they face "a substantial likelihood" of liability if suit were filed.[122]   Where, as here, the corporation's charter contains an exculpatory clause, as authorized under 8 *Del. C.* § 102(b)(7), "a substantial likelihood of liability may only be found to exist if the plaintiff pleads a non-exculpated claim against the directors based on particularized facts."[123]

As noted, to meet this burden, Plaintiffs allege a majority of the Demand Board face a substantial likelihood of liability for authorizing or failing to prevent

---

[121] *See* PAB at 49–53.

[122] *See Beam*, 845 A.2d at 1049; *Rattner v. Bidzos*, 2003 WL 22284323, at *9 n.47 (Del. Ch. Sept. 30, 2003) ("[F]or purposes of determining futility, the Individual Defendants who are not Director Defendants are largely irrelevant."); *In re Ezcorp Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *34 (Del. Ch. Jan 25, 2016) ("To determine whether the Board could properly consider a demand, a court counts heads.  If the board of directors lacks a majority comprising independent and disinterested directors, then demand is futile.").

[123] *Teamsters Union*, 119 A.3d at 62–63 (quotation omitted); Svikhart Aff. Ex. 3, Art. VIII (the exculpatory provision); *In re Tangoe, Inc. S'holders Litig.*, 2018 WL 6074435, at *12 n.79 (Del. Ch. Nov. 20, 2018) ("A court may take judicial notice of an exculpatory charter provision in resolving a motion addressed to the pleadings.") (citation omitted).

the alleged misstatements.[124] The Complaint begins its narrative by leaving a breadcrumb trail that appears to lead to a claim of oversight liability under *Caremark*.[125] But then the trail runs cold as Plaintiffs disclaim any attempt to plead a failure of Board oversight.[126] Then, just as the reader is about to fire the "help me I'm lost" flare, the Complaint pivots to assert a claim of malfeasance by virtue of the Board's role in actively causing GoPro to release false and misleading statements to its stockholders and the market.[127] While Plaintiffs' inconsistent proffers of their claim(s) have made the analysis more challenging than, perhaps, it needed to be, at

---

[124] Compl. ¶ 2. While Plaintiffs' Answering Brief makes separate arguments concerning Woodman (whose actions as CEO are unexculpated), the central inquiry remains whether there exists a *majority* of independent directors on the Demand Board capable of considering demand. PAB at 30; *McPhadden v. Sidhu*, 964 A.2d 1262, 1273 (Del. Ch. 2008) (stating officers do not benefit from a Section 102(b)(7) exculpatory charter provision). As I find Plaintiffs have failed to allege a majority of the Demand Board is unfit to consider demand, I do not reach the question whether Woodman faces a substantial likelihood of liability for his actions as CEO.

[125] *See, e.g.*, Compl. ¶ 187 ("[T]he Demand Defendants learned about the issues with the Karma drone and HERO5 cameras, and yet still allowed and/or failed to correct the misleading statements issued by the Company."), ¶ 189 ("[T]hese defendants permitted and/or failed to correct multiple materially false and misleading statements."), ¶ 209 ("In conscious disregard of their duties and responsibilities, the Director Defendants allowed [or] ignored . . . the numerous materially false and misleading statements."); PAB at 41 (Defendants "face a substantial risk of liability under a classic *Caremark* theory for failing to apprise themselves" of GoPro's "inadequate Karma drone supply."). *See also In re Caremark Intern. Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996) (Chancellor Allen's seminal decision drawing the contours of a failure of oversight claim).

[126] PAB at 39 ("Defendants [] mischaracterize Plaintiffs' claims as '*Caremark*' claims."); Tr. at 36–38 ("[W]e don't think this is a *Caremark* claim.").

[127] Compl. ¶ 209; ¶ 210 (Defendants "encouraged" false statements"); PAB at 39.

the end of the day it does not matter since neither theory, as pled, supports a reasonable inference that a majority of the Demand Board faces a threat of liability.

### 1. The False Disclosure Claim

"Whenever directors communicate publicly or directly with shareholders about a corporation's affairs, with or without a request for shareholder action, directors have a fiduciary duty to shareholders to exercise due care, good faith and loyalty."[128] If the board of directors intentionally misleads stockholders about the business of the corporation it serves, then its members will be held liable for breach of fiduciary duty.[129] With this in mind, it follows that directors who knowingly make materially misleading statements to stockholders "may be considered to be interested for the purposes of demand."[130]

Only one member of the Demand Board (Woodman) is alleged to have personally made a false or misleading public statement.[131] Plaintiffs attempt to implicate a majority of the Demand Board by alleging five of its members contributed to and approved GoPro's revenue guidance while knowing it was

---

[128] *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998).

[129] *Id.* at 14; *In re InfoUSA, Inc. S'holders Litig.*, 953 A.2d 963, 990 (Del. Ch. 2007).

[130] *InfoUSA*, 953 A.2d at 991.

[131] *See* Compl. ¶ 189 (alleging false statements by Woodman, McGee and Bates); Tr. at 33 (Plaintiffs' theory is that a majority of the Demand Board had "access to information that conflicted" with what management was telling stockholders.).

27

impossible for the Company to achieve the projected results.[132] In other words, Plaintiffs attempt to allege a majority of the Demand Board acted with *scienter*. When pressed at oral argument for "some particularized facts that would show the board was actually affirmatively saying to management, 'yes, keep telling the market that we're going to meet our revenue guidance, notwithstanding these production issues that we're having,'" Plaintiffs' counsel pointed to only one document: the "Bull and Bear Case" slide the Board reviewed on October 6, 2016.[133]

Nether this slide, nor anything else in the Complaint, reasonably supports the inference Plaintiffs ask the Court to draw. *First*, the "Bull and Bear Case" slide appears to be backwards-looking—not a forward-looking encouragement to continue misstating facts.[134] *Second*, all this slide shows is that the Board was considering the impact of product releases and macroeconomic trends on GoPro's stock price—i.e., that the Director Defendants "monitored" the Company's "business risk" as they were obliged to do under our law.[135]

---

[132] Compl. ¶¶ 2, 65, 186, 188, 189, 191; PAB at 24.

[133] Tr. at 37–38; Compl. ¶ 107; Serra Aff. Ex. 8 at GoPro220_000122.

[134] Serra Aff. Ex. 8 at GoPro220_000122 (containing a grid with a "Q3" "Bull" or "Bear" market and with Karma "in retail" or with "No Karma").

[135] *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 123 (Del. Ch. Feb. 24, 2009).

The fundamental problem with the inference Plaintiffs would have the Court draw is that Board *acquiescence* cannot support an inference of *affirmative* Board-level misconduct.[136] Even if the Board were told by its management that the Company was not going to meet its revenue projections, and then did nothing as management publicly stood by its market guidance, that factual predicate would support a "classic" *Caremark* claim for failure to respond to "red flags," not a claim against the Board for causing the Company to make false disclosures.[137] Contrary to Plaintiffs' assertion, if directors have "actual knowledge" of wrongdoing and "fail[] to take corrective action," that *is* a *Caremark* claim.[138]

---

[136] *See McElrath on Behalf of Uber Tech., Inc. v. Kalanick*, 2019 WL 1430210, at *8 n.125 (Del. Ch. Apr. 1, 2019) ("The distinction between *affirmative action* by a board and *inaction* by the board is important when considering how to apply *Rales* and whether to apply *Aronson*.") (emphasis in original); *Teamsters Union*, 119 A.3d at 57–58 (holding that, under Rule 23.1, a court need not draw "hyper-technical and unreasonable" inferences that are based on "unsupported leap[s] of logic").

[137] *Melbourne Mun. Firefighters' Pension Trust Fund on Behalf of Qualcomm, Inc. v. Jacobs*, 2016 WL 4076369, at *8 (Del. Ch. Aug. 1, 2016) (describing a failure to respond to "red flags" as a classic *Caremark* claim); *Sandys v. Pincus*, 2016 WL 769999, at *14–15 (Del. Ch. Feb. 29, 2016), *rev'd on other grounds*, 152 A.3d 124 (Del. 2016) (characterizing a claim that directors knowingly "failed to disclose material information to the public" as a *Caremark* claim).

[138] PAB at 40; *Horman v. Abney*, 2017 WL 242571, at *10 (Del. Ch. Jan 19, 2017) ("To establish demand futility under *Caremark*'s second prong, the Complaint must plead particularized facts that the board *knew* of evidence of corporate misconduct—the proverbial 'red flag'—yet acted in bad faith by consciously disregarding its duty to address that misconduct.") (emphasis supplied); *South v. Baker*, 62 A.3d 1, 18 (Del. Ch. 2012) (reviewing a board's alleged "knowledge of wrong-doing or conscious indifference to alleged red flags" under *Caremark*).

It is not surprising Plaintiffs have failed to plead particularized facts to support an inference of affirmative Board-level misconduct given that they have failed to plead any facts that would offer a conceivable explanation of *why* a majority of the Demand Board would intentionally cause the Company to release false statements to the market knowing full well the Karma inventory shortage would be known to stockholders and the market within a matter of weeks.[139] While the Complaint alleges the Selling Defendants sold shares during 2016 (which might, under different circumstances, reveal some explanation of why the Board would affirmatively mislead the market), only one Selling Defendant, Woodman, is a member of the Demand Board.[140] And, as explained below, the Complaint fails to plead any facts that would allow a reasonable inference that a majority of the Demand Board was beholden to Woodman or any of the other Selling Defendants such that they would be motivated to facilitate or cover up illegal insider trading.[141]

Plaintiffs' only half-hearted attempt at pleading the Demand Board lacked independence is to allege Woodman "controls over 75% of . . . the Company's stockholders' voting power" and could "remove[]" any director who voted against

---

[139] *See Ryan v. Armstrong*, 2017 WL 2062902, at *5 (Del. Ch. May 15, 2017) (refusing to credit allegations of bad faith absent credible motive).

[140] Compl. ¶¶ 160, 183.

[141] Compl. ¶¶ 160–65, 183; PAB at 49.

his interests.[142] It is well-settled that a controlling stockholder's voting power and "select[ion]" of directors do not, without more, render directors "beholden" to the controller.[143] In the absence of a legally cognizable explanation for why the Demand Board would lie so openly, especially when they were virtually certain to be caught in the lie, it is unreasonable to infer bad faith malfeasance.[144]

## 2. The Apparent *Caremark* Claim

Although Plaintiffs disclaim any effort to plead a *Caremark* claim, it is difficult to ignore the allegations in the Complaint that walk and talk like *Caremark*.[145] Lest there be any question that I have not considered all angles that might reveal demand futility, I address the *Caremark*-like allegations below.

---

[142] Compl. ¶ 195.

[143] *Beam*, 845 A.2d at 1054 (Even in the face of "overwhelming voting control[,] . . . [a] stockholder's control of a corporation does not excuse presuit demand on the board without particularized allegations of relationships between the directors and the controlling stockholder demonstrating that the directors are beholden to the stockholder."); *Aronson*, 473 A.2d at 815; *In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173, 1180 (Del. 2015). Similarly, Plaintiffs' argument that members of the Demand Board have "been heavily compensated for their service on the Board" is insufficient to excuse demand because "ordinary director compensation alone is not enough to show demand futility." *A.R. DeMarco Enter., Inc. v. Ocean Spray Cranberries, Inc.*, 2002 WL 31820970, at *5 (Del. Ch. Dec. 4, 2002) (citing cases); Compl. ¶ 196.

[144] *See In re Novell, Inc. S'holder Litig.*, 2014 WL 6686785, at *7 (Del. Ch. Nov. 25, 2014) ("An analysis of motives is [] key to determining whether a fiduciary acted in bad faith."); *Armstrong*, 2017 WL 2062902, at *5 (same).

[145] *See Horman*, 2017 WL 242571, at *7 (describing a board knowing "of evidence of corporate misconduct . . . yet act[ing] in bad faith by consciously disregarding its duty to address that misconduct" as a *Caremark* claim).

A director will face liability under *Caremark* when, in bad faith, she fails to oversee company operations.[146]

> Bad faith is established, under *Caremark*, when 'the directors [completely] fail[] to implement any reporting or information system or controls[,] or . . . having implemented such a system or controls, consciously fail[] to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention.'[147]

"Thus, to establish oversight liability a plaintiff must show the directors *knew* they were not discharging their fiduciary obligations or that the directors demonstrated a *conscious* disregard for their responsibilities such as by failing to act in the face of a known duty to act."[148]

Where, as here, there is an exculpatory clause in the corporate charter, "it is not enough to allege that the misleading statements occurred on [the] directors' watch; nor is it enough to plead facts from which [the court] may infer negligence, or even gross negligence, in the directors' failure to cure the misimpression created by the statements."[149] Instead, Plaintiffs must well plead that the directors acted in

---

[146] *Marchand v. Barnhill*, 212 A.3d 805, 820 (Del. 2019).

[147] *Id.* at 821 (quoting *Stone ex rel. AmSouth Bancorp v. Ritter*, 911 A.2d 362, 370–72 (Del. 2006)).

[148] *Citigroup*, 964 A.2d at 123 (emphasis in original).

[149] *Ellis v. Gonzalez*, 2018 WL 3360816, at *11 (Del. Ch. July 10, 2018).

bad faith when they allowed the alleged misstatements to be made and then failed to correct them.[150]

To meet this standard, Plaintiffs' core allegation is that by September 19, a majority of the Demand Board *knew* "there was no way GoPro would meet" its revenue guidance and yet it failed to cause that guidance to be corrected or to prevent management from continuing to report that the guidance was attainable.[151] I assume, for this analysis, that Plaintiffs are characterizing this omission as a failure to respond to "red flags" under *Caremark*'s second prong.[152] Plaintiffs maintain the Court can reasonably infer this Board-level knowledge because of the following

[150] *Id.*; *Okla. Firefighters Pension & Ret. Sys. v. Corbat*, 2017 WL 6452240, at *14 (Del. Ch. Dec. 18, 2017) ("Scienter" requires a showing that a director "knew" he was acting inconsistently with his fiduciary duties.).

[151] Compl. ¶¶ 91–93; PAB at 10–12; Tr. at 36–39. While not clear, at times in their Answering Brief, Plaintiffs hint that they may be faulting the Demand Board for not requiring management to update revenue projections after the Karma recall on November 8. *See* PAB at 42. To the extent this is Plaintiffs' argument, Plaintiffs have not pled that management knew the full financial impact of the Karma recall until the Company was ready to release its full-year results. "Management cannot disclose projections that do not exist." *In re BioClinica, Inc. S'holder Litig.*, 2013 WL 673736, at *5 (Del. Ch. Feb. 25, 2013). Instead, the Company disclosed what it *did* know (i.e., the need for the recall and that GoPro had sold only 2,500 drones to date). Compl. ¶ 117.

[152] Compl. ¶ 209; PAB at 41–42 (arguing Defendants failed to respond to "red flags"). It is no surprise Plaintiffs do not allege a total failure to implement an oversight system under *Caremark*'s first prong because the Board maintained an active Audit Committee and GoPro had a "real-time" supply chain "monitoring system," which the Audit Committee and the Board writ large regularly reviewed with the assistance of Company management. Compl. ¶¶ 72–75, 85.

facts: a majority of the Demand Board had "access to the Netsuite ERP system;"[153] consumers posted videos showing Karma's defect;[154] GoPro "had an existing supply of only 2,500 Karma drones" at the beginning of the fourth quarter;[155] Karma had limited availability after its launch;[156] and members of the Board saw various slides at Board meetings discussing "risk" surrounding Karma.[157]

Although Plaintiffs throw everything against the wall, nothing sticks. While Plaintiffs urge the Court to infer *scienter*, the Complaint pleads no facts that would allow a reasonable inference a majority of the Demand Board knew GoPro was misleading investors with any of its public statements during 2016.

*First*, Plaintiffs incorrectly assert Board members had a duty to "access" Netsuite and extrapolate on its own that the Company had incurable inventory shortages.[158] As Chancellor Allen noted in *Caremark*, "the duty to act in good faith to be informed cannot be thought to require directors to possess detailed information about all aspects of the operation of the enterprise. Such a requirement would simply

---

[153] Compl. ¶¶ 75, 80.

[154] Compl. ¶ 100; PAB at 36 (alleging Goldman, Gotcher, Lurie and Zalaznick face a substantial likelihood of liability); *see also* PAB at 41–42.

[155] Compl. ¶¶ 8, 93, 109.

[156] Compl. ¶¶ 99–100.

[157] Compl. ¶¶ 83, 97, 108.

[158] Compl. ¶ 95.

be inconsistent with the scale and scope of efficient organization size in this technological age."[159] Taking a self-guided tour through an ERP system to check inventory levels for a product that would comprise only 10% of the Company's revenue is not the sort of "oversight" *Caremark* contemplates.[160]

In a similar vein, a few YouTube videos showing Karma's battery defect cannot be considered "red flags" that were "waived" in front of the Board.[161] Even if they *were* red flags, the Board met to discuss "proposed recall plans" just eleven days after the first video was posted.[162] A *Caremark* claim cannot be squared with an allegation the Board *responded* to red flags.[163]

Continuing with their unrealistic expectations, Plaintiffs claim the Board "would have been made aware of [Karma's] obvious battery defect had [GoPro]

---

[159] *Caremark*, 698 A.2d at 971.

[160] Compl. ¶¶ 109–10, 189 (bullet 9). This is especially true when considered against the backdrop of the Karma Production Forecast, which I discuss in more detail below. "'Red flags' are only useful when they are [] waived in one's face or displayed so that they are visible to the careful observer." *In re Citigroup Inc. S'holders Litig.*, 2003 WL 21384599, at *2 (Del. Ch. June 5, 2003).

[161] Compl. ¶ 76; *Citigroup*, 2003 WL 21384599, at *2 (To constitute a red flag, Plaintiffs must plead information "came to the attention of the board.").

[162] Compl. ¶¶ 98, 100, 116.

[163] *White v. Panic*, 793 A.2d 356, 371 (Del. Ch. 2000); *South*, 62 A.3d at 18; *Horman*, 2017 WL 242571, at *14 (stating that a *Caremark* claim is incongruous with allegations that when "red flags were waived," the "Board responded").

35

adequately tested the drones."[164]   This conclusory pleading is insufficient under Rule 23.1.  Delaware law has long-rejected the notion that board members should be held personally liable for a company's "ineffective" attempts to manage business risk unless the court finds it reasonable to infer a conscious, subjective awareness on the part of a board member that she was not fulfilling her fiduciary duties.[165]  Plaintiffs offer no well-pled facts supporting an inference that a majority of the Demand Board personally *knew* about Karma's defect, could meaningfully address the issue at the Board level and yet elected to do nothing.

*Second*, Plaintiffs strenuously assert the Board knew there was "no way GoPro would meet" its revenue guidance as of September 19 because the Company had only 2,500 drones in inventory.[166]  But Plaintiffs offer no reason to infer the Board should have disregarded management's November 1 Karma Production Forecast stating the "Very early-Targeting" for Karma production was "80K in 4th

---

[164] Compl. ¶ 103.

[165] *Citigroup*, 964 A.2d at 130 ("[T]he mere fact that a company takes on business risk and suffers losses" or that a board does not "properly evaluate business risk" "does not evidence misconduct."); *Stone*, 911 A.2d at 368 (same); *Desimone v. Barrows*, 924 A.2d 908, 935, 936 n.97 (Del. Ch. 2007) ("[T]o hold directors liable for a failure in monitoring, the directors have to have acted with a state of mind consistent with a conscious decision to breach their duty of care."); *Okla. Firefighters*, 2017 WL 6452240, at *14, *20 ("[A]n ineffective response does not, without more, indicate bad faith.").

[166] Compl. ¶¶ 91, 93.

quarter"—a number of units within the range Plaintiffs allege GoPro needed to meet its revenue guidance.[167]

Considering the *presumption* of directorial good faith, as well as the Board's statutory right to rely on management's reports, the Karma Production Forecast renders unreasonable any inference the Board *knew* GoPro was headed for a significant revenue miss.[168] Management told the Board the Company was capable of producing 80,000 drones in the fourth quarter based on *specific* suppliers and

---

[167] Compl. ¶¶ 91, 93, 111–12 (alleging the Company would need to sell "around 50,000–75,000 units" to meet its revenue guidance); Svikhart Aff. Ex. 6 at GoPro220_000138. While Plaintiffs' Motion to Strike challenges Defendants' reliance on certain documents, the Karma Production Forecast is *not* among the challenged documents. *See* D.I. 18. I may review documents cited in the Complaint "to ensure that the plaintiff has not misrepresented [their] contents and that any inference the plaintiff seeks to have drawn is a reasonable one." *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 797 (Del. Ch. 2016), *rev'd on other grounds*, *Tiger v. Boast Apparel, Inc.*, 2014 A.3d 933 (Del. 2019). Plaintiffs argue I cannot weigh competing factual interpretations of incorporated documents on a motion to dismiss. PAB at 34. That is true. But a plaintiff likewise "may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms." *Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013). I am permitted to review incorporated documents "to ensure that the plaintiff cannot seize on a document, take it out of context, and insist on an unreasonable inference that the court could not draw if it considered related documents." *Id.* at 798. *See also In re Clovis Oncology, Inc. Deriv. Litig.*, 2019 WL 4850188, at *14 n.216 (Del. Ch. Oct. 1, 2019) (noting that while "Section 220 documents, hand selected by the company, cannot be offered to rewrite an otherwise well-pled complaint," they can be offered, and considered by the Court, to ensure the plaintiff is not taking documents out of context). That is all I have done here. Plaintiffs make much of management's slides showing the Company had only 2,500 drones in its inventory as it entered Q4. *See* Compl. ¶¶ 93, 109, 113. The Karma Production Forecast merely places that piece of information in the full context of what management was telling the Board in real time.

[168] *Aronson*, 473 A.2d at 812; 8 *Del. C.* § 141(e).

37

*specific* yield rates.[169] The Director Defendants had a right to rely on this report and, in turn, had a basis reasonably to conclude GoPro would overcome its inventory shortage.[170] The fact that GoPro's Karma inventory was only 2,500 in the run-up to the 2016 holiday season is, therefore, not a basis to infer bad faith.[171]

Finally, in their Answering Brief, Plaintiffs underscore a number of slides discussing "risk" associated with Karma, specifically, (i) the May 3 slide stating Karma's "delays [were] adding risk";[172] (ii) the October 6 Board slide discussing a

[169] Svikhart Aff. Ex. 6 at GoPro220_000138. Similarly, with the Karma Production Forecast in hand, the Board could reasonably conclude Woodman's September 19 representation that Karma would be "distributed . . . globally" was not a misrepresentation. Compl. ¶ 91.

[170] 8 *Del. C.* § 141(e). While the California Court may have inferred the *Bielousov* Defendants "knew that 2,500 drones would be insufficient," the inquiry this Court must undertake is different. *See Bielousov v. GoPro, Inc.*, 2017 WL 3168522, at *6 (inferring certain GoPro officers "knew that 2,500 drones would be insufficient"). *First*, as noted, the Court may consider Section 220 documents (such as the Karma Production Forecast) that have been incorporated by reference. The plaintiffs in the California Court "did not have access to" the Section 220 materials made available to Plaintiffs here. Tr. at 33. *Second*, the claims before the California Court pertained to the conduct of the *Bielousov* Defendants (all of whom were GoPro officers). Here, the relevant inquiry is whether Plaintiffs have well pled a majority of the *Demand Board* acted with scienter—a standard that requires Plaintiffs to plead these defendants were "conscious" they were not fulfilling their fiduciary duties. *Desimone*, 924 A.2d at 935.

[171] Compl. ¶ 117. Plaintiffs argue "[p]rior [i]nventory [i]ssues" GoPro had with the HERO4 line of cameras in 2015 were "red flags" that the Board ignored in regards to the Company's Karma inventory. PAB at 41. Plaintiffs offer no reason why overproduction of an unrelated product would or should have led the Board to question the Karma Production Forecast.

[172] Compl. ¶ 83.

38

total "Q4 revenue risk" of "$45–110M" of which "$20M–$85M" was attributed to Karma;[173] and (iii) the October 24 Audit Committee slide "looking ahead" to "significant accounting and reporting items" for "Q4'16"—one of which was "revenue recognition—Karma sales returns reserve."[174] I gather Plaintiffs present these slides as factual support for an allegation the Board ignored red flags since they reveal "it was almost certain" GoPro could not meet its revenue guidance.[175] Nothing about these slides supports a reasonable inference the Board *knew* the Company would miss its guidance or consciously disregarded risk. Rather, at best, they show the Board was making a good faith effort to monitor GoPro's business risk as Karma production continued.

As GoPro warned its stockholders, every business involves risk.[176] "The essence of the business judgment of . . . directors is deciding how the company will evaluate the trade-off between risk and return."[177] Whether the Board properly struck that balance in the exercise of its business judgment is irrelevant to Plaintiffs'

---

[173] Compl. ¶ 97; Serra Aff. Ex. 8 at GoPro220_000121.

[174] Compl. ¶ 108; Serra Aff. Ex. 12 at GoPro220_000197.

[175] PAB at 10–11.

[176] *See* February 8-K.

[177] *Citigroup*, 964 A.2d at 126.

effort to excuse their failure to make a demand. In other words, Plaintiffs cannot "equate a bad outcome with bad faith."[178]

### C. Plaintiffs Have Failed to Well Plead Demand Futility With Respect to Counts I and IV

In Counts I and IV, Plaintiffs bring claims against the Officer Defendants and Selling Defendants.[179] While Plaintiffs concede the gravamen of their demand futility allegations pertain to the Demand Board's alleged liability stemming from GoPro's public statements, they make two last-ditch demand futility arguments related to the *Bielousov* action and their *Brophy* claim.[180] *First*, based on this court's rulings in *In re Fitbit* and *Pfeiffer v. Toll*, Plaintiffs argue that "not a single member of the Demand Board could have considered a demand impartially because doing so would have been tantamount to admitting liability in the then-pending *Bielousov*

---

[178] *Stone*, 911 A.2d at 373. Plaintiffs ask for an inference the Board *knew* the Company would miss its projections because "the difference between the $54 million in Karma's fourth quarter sales that GoPro had led the market to believe would be realized and the $2.75 million that was actually attainable at the time [was] $51.25 million [which] falls in the mid-range of the Karma risk profile that the Board internally acknowledged during the October 6, 2016 Board update." Compl. ¶ 113. This math shows the Board accurately assessed *risk* (not certainty) associated with rolling out the Karma drone. As noted, management told the Board on November 1, 2016, that the Company was going to be able to produce enough units to meet inventory projections. This renders unreasonable the allegation the Board *knew* GoPro was headed for a significant revenue miss.

[179] Compl. ¶¶ 200–04, 221–28.

[180] PAB at 43, 50.

Action."[181]  *Second*, Plaintiffs argue demand is futile as to Count IV because "pressing forward" with the *Brophy* claim would "compromise or undercut [a majority of the Demand Board's] defense for another claim."[182]

Plaintiffs' reliance on *Fitbit* and *Pfeiffer* is misplaced.  Both cases held demand was futile based on a companion federal securities action in which at least *a majority* of the relevant demand board was named as a defendant.[183]  Here, only one member of the Demand Board (Woodman) is named as a defendant in either the *Bielousov* action or with respect to the *Brophy* claim *sub judice*.[184]  And, as noted, Plaintiffs have not well pled any member of the Demand Board is beholden to Woodman.[185]

---

[181] PAB at 50 (citing *Pfeiffer v. Toll*, 989 A.2d 683, 689 (Del. Ch. 2010), *rev'd on other grounds*, *Kahn v. Kolberg Kravis Roberts & Co., L.P.*, 23 A.3d 831 (Del. 2011); *In re Fitbit, Inc. S'holder Deriv. Litig.*, 2018 WL 6587159, at *16 (Del. Ch. Dec. 14, 2018); *Guttman v. Huang*, 823 A.2d 492, 502 (Del. Ch. May 5, 2008) (explaining that, under certain circumstances, demand may be excused under *Rales* if a majority of a demand board is "influenced by improper considerations" such as a "substantial likelihood of personal liability" in related litigation) (quotations omitted).

[182] PAB at 49.

[183] *See Pfeiffer*, 989 A.2d at 690 ("All of the individual defendants . . . are named as defendants in a companion federal securities action."); *In re Fitbit*, 2018 WL 6587159, at *11, *16 (Four of seven demand board members were defendants in a federal securities class action.).

[184] Compl. ¶¶ 30, 183, 189, 222.

[185] *Rojas v. Ellison*, 2019 WL 3408812, at *14 (Del. Ch. July 29, 2019) (reaching the same conclusion on similar facts); *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 821–22 (Del. Ch. 2005) (stating that directors are neither interested nor beholden to an

Given Plaintiffs' failure to plead a majority of the Demand Board faces a substantial likelihood of personal liability, either with respect to the related securities litigation or the *Brophy* claim pending here, neither can be deemed a basis to excuse demand.[186]   As Plaintiffs have failed to plead particularized facts to support an inference that the Demand Board cannot manage the Company's litigation asset, including its potential claims against the Officer Defendants and the Selling Defendants for breach of fiduciary duty, these claims also must fail under Rule 23.1.

## III.  CONCLUSION

For the foregoing reasons, Defendants' Motion must be **GRANTED**.  The Complaint is dismissed with prejudice.

**IT IS SO ORDERED.**

---

interested person if their "decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences").

[186] *Orman v. Cullman*, 794 A.2d 5, 23 (Del. Ch. 2002) (Only a substantial likelihood of liability would make it "improbable that the director could perform her fiduciary duties to the shareholders.") (internal quotation omitted).